UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
_____

PEARSON E. MILES, JR.

                              Petitioner,               **No. 04-CV-6156(VEB)**
              -vs-                                        **DECISION AND ORDER**

JAMES CONWAY, Superintendent,
Attica, Correctional Facility,

                              Respondent.
_____

## I.      Factual Background and Procedural History

*Pro se* petitioner Pearson E. Miles, Jr., ("Miles" or "petitioner") has filed a petition for a

writ of habeas corpus pursuant to 28 U.S.C. § 2254 challenging his conviction following a jury

trial in New York State Supreme Court, Erie County, on one count of first degree "course of

sexual conduct against a child" (New York Penal Law ("P.L.") § 130.75 (former subsection (a))[1]

and one count of "endangering the welfare of a child" (P.L. § 260.10(1)). The charges here arose

from allegations that Miles, from December 1, 1997, until June 16, 1998, repeatedly sodomized

and had anal sexual intercourse with the seven-year-old daughter ("D.C.") of his girlfriend. At

the time of the alleged incidents, Miles was living with his girlfriend and her two children at her

apartment Buffalo, New York. D.C. disclosed the abuse after her mother found dried blood on

D.C.'s underwear while folding laundry, and then confronted her daughter about it. Trial on the

two-count indictment commenced on January 11, 1999, and ended on January 19, 1999.

_____

[1]       Former P.L. § 130.75(2) provided as follows:  "A person is guilty of course of sexual conduct
against a child in the first degree when, over a period of time not less than three months in duration, he or she
engages in two or more acts of sexual conduct, which includes at least one act of sexual intercourse, deviate sexual
intercourse or aggravated sexual contact, with a child less than eleven years old."

Following is a summary of the relevant trial testimony.

The victim, who was eight-years-old at the time of the trial, testified that she had known petitioner since September of 1997. The first occasion of abuse she could recall was on or about December 7, 1997. T.79-80, 210-12, 232, 246.[2]  That night, petitioner had gotten D.C. out of bed and had brought her to the front of the house while everyone else was sleeping. T.233. On another occasion, petitioner tricked her by telling her that she needed to go to the basement to help wash clothes. T.214. Once they were downstairs, petitioner told her to take her pants down and bend over. He then put his "private" in her "rear", causing her pain. T.214-15.

D.C. related that petitioner did this to her on different days between December 1997 and June 1998. The assaults occurred in the basement, in the back hallway, in D.C.'s bedroom, in her mother's bedroom, and in the living room. T.214-221. D.C. recalled that on one occasion, petitioner put his tongue on her vagina, and that a few times he made her put her mouth on his penis. T.221-22. D.C. testified that on the occasions when petitioner anally sodomized her, he also touched his penis to her vagina. T.220-21. She described one instance of vaginal intercourse, stating that he had put his "private" inside her body. T.223. D.C. explained that she did these things because petitioner told her to. On occasion, petitioner would give her dollar bills after he sodomized her. T.215, 222. D.C. testified that no one else besides petitioner did the above-described sexual acts to her.

Tricia Cahee ("Cahee"), D.C.'s mother, met petitioner in the summer of 1997. Petitioner met her two children (D.C. and a younger son) in September of that year. T.386.  Petitioner had moved in with Cahee and the children to a new apartment on Vernon Place in December 1997.

---

[2]          Citations to "T.___" refer to pages from the trial transcript.

Cahee acknowledged that petitioner provided financial support for her and her children, buying them food and clothing. T.171. Petitioner would fix dinner for the family and drive Cahee to work. T.389. Cahee testified that petitioner used to babysit for the children, while she was in the house and also when she was out, so petitioner would routinely be alone with them. T.58-87, 191-92. Cahee testified that she had suspicions that some type of abuse was occurring while petitioner was watching her children. When she questioned her daughter about this possibility "not a whole lot of times . . . [m]aybe a few times," T.191, D.C. denied that anything was happening to her. Cahee recalled that "[p]ossibly once" she actually heard D.C. "screaming" while she was in one part of the apartment and D.C. and petitioner were in another. This was "maybe December of 1997," but she could not "really say a date." T.87. Despite Cahee's suspicions, she never followed up on them until six months later, in June of 1998, when she allegedly discovered a stain of dried blood on her daughter's underwear.

Cahee testified that she and petitioner had an "up and down" relationship that was not free from conflict, but that they worked their difficulties out. Cahee testified that on an unspecified occasion, the victim had told her that she did not want Cahee to continue her relationship with petitioner. T.88, 89-90, 128. According to Cahee, she and petitioner had engaged in anal sex on one occasion, at petitioner's suggestion. T.88-89, 150. However, Cahee said, she did not like it and they did not engage in that practice again. Cahee testified that the reason her relationship with petitioner began to deteriorate was because of the "things" petitioner wanted her to do. T.90. According to Cahee, petitioner had threatened her and "shook her" physically on one occasion, which she described as him starting to "get violent."T.91, 150. Cahee stated that when she had tried to end the relationship with him at one point, he started to harass

her. T.92.

On June 16, 1998, the day that she later discovered the stained underwear, Cahee testified that petitioner had insisted on driving her to work first, before taking D.C. to school and Cahee's son to daycare. T.93-94. Cahee was dropped off first at 8:52 a.m., well ahead of her shift at work, which started at 10 a.m. T.467-68. She was so early that she had to wait just to get inside the building. T.98.

D.C. explained that on the morning of June 16, 1998, after they dropped her mother off at work, petitioner drover her brother to daycare. Petitioner drover her back to the apartment and brought her into her mother's bedroom, where he anally sodomized her. T.217-19, 220-22, 240-41, 236-37, 248-50. D.C. recounted that petitioner made her lie on her stomach on her mother's bed, and petitioner got on top of her and "the same thing" that he had done to her in the basement on an earlier occasion–that is, he inserted his penis into her anus. T.214-17. After sodomozing D.C., petitioner drove her to school. On the way, he threatened to do it "even harder" if D.C. told anyone about the incident. T.222-23, 245. D.C. testified that she was late for school and had to check in at the school office when she arrived; however, the defense pointed to school attendance records indicating that D.C. had not been late on that day. T.238-39, 242, 371-75, 377, 379.

D.C. explained that she had never told anyone that petitioner had hurt her before June 16th. She confirmed that her mother had, on occasion, hit her with a belt, and that she was afraid to tell her mother about the incidents involving petitioner. T.231-32, 250.

Cahee left work between 2 p.m. and 3 p.m. that day, arriving home before her children did. T.101. While at home doing laundry, Cahee observed what she thought was dried blood on D.C.'s underwear, which she had just taken out of the clothes-dryer. T103-04, 172, 225.

-4-

(Although Cahee testified that she did not see blood on D.C.'s underwear when she washed it on June 15th, T.185, D.C. claimed that she put her underwear in the wash on June 16th, T.243.) Cahee then confronted her daughter with this discovery and asked if petitioner or anyone else had touched her in a way that was not proper. T.104, 172, 244. Cahee testified that D.C. initially denied it but eventually explained that petitioner was the reason for the blood found in her underwear. T.104.[3] Cahee related that D.C. told her that she had been afraid to tell her about the abuse earlier. T.104-05, 225.

Cahee then contacted some of her family members and called the police. Petitioner moved out at some point during the afternoon of June 16, 1998. That evening D.C. was brought by her mother to the hospital where she was examined by Laurie Wallace, R.N. ("Nurse Wallace"), an emergency room nurse for the past six year, who had experience examining hundreds of children. T.40.[4] After asking D.C. what had happened, Nurse Wallace and Dr. Steif conducted a physical examination. *See* T.40-45, 49, 68, 76. Nurse Wallace noticed that D.C.'s rectal area was irritated, with some redness and some tearing. *See id.* According to Nurse Wallace, D.C. had a relatively large vagina for her age. *Id.* As part of the examination, Nurse Wallace took photographs of D.C.'s genital and anal areas; these images were introduced into evidence at trial and displayed for the jury by means of a slide projector. T.51-53, 68.[5]

One week later, on June 23, 1998, Dr. Jack Coyne, the Medical Director of the Children's

---

[3]    Efforts to scientifically determine whether the substance observed by Cahee on her daughter's underwear was blood were unsuccessful. T.309.

[4]    Citations to "T.___" refer to pages in the trial transcript.

[5]    Dr. Steif did not testify at trial. Defense counsel's request for a missing witness charge was denied by the trial court.

Advocacy Center and the Director of Pediatrics for Mercy Hospital, examined D.C. His examination included a review of the photographs taken during D.C.'s emergency room visit. Dr. Coyne observed in the photographs of D.C. three (3) anal tears or fissures, as well as redness in the girls rectal area. He considered these physical findings to be "not normal." T.339-41. From the nature of the injuries as depicted in the photographs, Dr. Coyne concluded that they were caused by some instrumentality "from the outside, going in" to the child's anus. T.341. Dr. Coyne opined that the anal tears (or fissures) depicted in the photographs were consistent with sexual abuse having occurred. T.340-42. Dr. Coyne's own examination of D.C. on June 23rd revealed that the fissures observed in the photographs had healed in the intervening week's time. Dr. Coyne opined that rapid healing was not unusual because the tissues in that area of the body healed very quickly. T.347.  Dr. Coyne also noted that in cases where the attacker knows the victim, he or she will often use lubricants. T.347-51. Dr. Coyne admitted on cross-examination that he had no idea what caused the rectal injuries he observed in the victim. T.355.

With regard to the victim's hymen, Dr. Coyne observed that it was intact, regular, normal, and smooth, with no tears or discharges. T.345-46. Dr. Coyne could not explain why the emergency room doctor, Dr. Steif, had indicated, "absent hymen" in the section of the report dealing with the examiner's observations of the patient's genitalia.

The prosecution called Stefan Perkowski ("Perkowski") as an expert psychological witness. Perkowski testified that he was the Director of Child and Adolescent Treatment Services, providing mental health outpatient services for children throughout Erie County. T.267. Perkowski explained the five components of what he termed child sexual abuse accommodation syndrome and offered reasons why a child who had been sexually abused might not necessarily

report the abuse as soon as it happened. T.278. Perkowski explained that a child might not reveal ongoing abuse because of the size difference between him or her and the adult, or because of other factors such as bribery by the adult or more overt forms of intimidation. T.281. Perkowski testified that a child might refrain from reporting the abuse in order to avoid creating a conflict between the offending adult and another adult caretaker, or might not believe that the caretaker had the fortitude or courage to do anything to halt the abuse. T.288-89. In addition, Perkowski said, the child could fear the person to whom the disclosure might otherwise be made, explaining that the child could suffer from "misplaced guilt" for having failed to come forward earlier. T.293. Finally, Perkowski discussed delayed, conflicted, and/or unconvincing disclosures of abuse, as well as disclosure that was prompted by direct inquiry.

Petitioner testified that he met Cahee during the summer of 1997; he met her two children (D.C. and a younger son) in September of that year. T.386. He had moved in with Cahee to a new apartment on Vernon Place in or about December 1997, and contributed financially to household expenses. T.390, 406, 420. Petitioner testified that his and Cahee's sexual relationship commenced in February of 1998, and was mutually satisfactory. T.392. In contrast to Cahee's testimony, they had anal sex only one time, at her suggestion. Neither of them enjoyed it so they did not do it again. T.407. Petitioner testified that in either April or May of 1998, he learned that Cahee was pregnant with his baby and she wanted to end the pregnancy. T.393-94. The two of them did not agree on this issue and had heated arguments over it. T.394-95, 430.

Petitioner testified that his birthday was on June 16, 1998, and that was the day he decided to move out, citing irreconcilable problems in his relationship with Cahee. T.90-92, 102, 218, 242, 398-99, 431, 442. Petitioner claimed that, the week before, he had shared his decision

with Cahee to leave, and Cahee tried to talk him out of it. T.431-33. Petitioner testified that on the morning of June 16th, he had, as was his routine, driven Cahee to work and the children to school and daycare. T.399-402, 426, 435. Later that day, during a phone conversation with Cahee, petitioner learned that she had gotten her "tubes tied" and that the pregnancy had been terminated. T.402, 405. (Cahee confirmed the substance of this conversation. T.168-69, 180). Petitioner testified that he was greatly upset by this news and hung up on Chaee. T.403, 405.

Petitioner denied ever striking Cahee, but admitted that he may have spanked the two children a couple of times. T.395-96. Petitioner denied having committed the sexual assaults on D.C. T.390. He testified that he had a loving relationship with both of Cahee's children and treated them as if they were his own. Petitioner testified that had never sodomized or hurt D.C. or any other children, and could not imaging even doing such a thing. T.390, 407, 420.

The jury convicted Miles as charged in the indictment. He was sentenced on April 23, 1999, as a first-time felony offender, to an indeterminate prison sentence of 9 to 18 years on the "course of sexual conduct" conviction, with a concurrent determinate term of 1 year on the "endangering the welfare of a child" conviction.

Petitioner's conviction was unanimously affirmed on direct appeal by the Appellate Division, Fourth Department, of New York State Supreme Court. Proceeding *pro se*, Miles then instituted three subsequent motions to vacate the judgment pursuant to New York Criminal Procedure Law ("C.P.L.") § 440.10. These were all denied.

This federal habeas petition followed. In Attachments ##13, 14 & 15 (Docket #1), Miles has raised seven grounds for habeas relief. Respondent answered the petition, interposing the affirmative defense of procedural default with respect to several claims and arguing that, in any

event, none of the claims have merit. The parties have consented to disposition of this matter by a magistrate judge pursuant to 28 U.S.C. § 636(c)(1).

After reviewing the trial transcript and state court records, and the parties' pleadings filed in the instant proceeding, the Court finds that Miles' request for a writ of habeas corpus should be denied and that the petition should be dismissed.

## II.      Standard of Review

Miles' petition was filed after the enactment of the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), and so the provisions of AEDPA govern this Court's disposition of his habeas claims. Under AEDPA, a federal court may grant a writ of habeas corpus to a state prisoner on a claim that was "adjudicated on the merits" in state court only if it concludes that the adjudication of the claim "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d).

An "adjudication on the merits" is a "substantive, rather than a procedural, resolution of a federal claim." *Sellan v. Kuhlman*, 261 F.3d 303, 313 (2d Cir.2001) (quoting *Aycox v. Lytle*, 196 F.3d 1174, 1178 (10th Cir.1999)). Under the "contrary to" clause, "a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by [the Supreme Court] on a question of law or if the state court decides a case differently than this Court has on a set of materially indistinguishable facts." *Williams v. Taylor*, 529 U.S. 362, 412-13, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000) (O'Connor, J., concurring and writing for the majority in this

part). Under the "unreasonable application" clause, "a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from this Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." *Id.* at 413. Under this standard, "a federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable." *Id.* at 411. In order to grant the writ there must be "some increment of incorrectness beyond error," although "the increment need not be great; otherwise, habeas relief would be limited to state court decisions so far off the mark as to suggest judicial incompetence." *Matter of Francis S. v. Stone*, 221 F.3d 100, 111 (2d Cir.2000) (internal quotation marks omitted).

## III.  Discussion

### A.  Ground One: The trial court erroneously denied a for-cause challenge to a prospective juror.

Miles contends that the trial court improperly denied defense counsel's for-cause challenge with regard to a prospective juror, who worked as a deputy superintendent with the New York State Department of Corrections. Following the denial of the for-cause challenge, trial counsel decided to exercise a peremptory challenge to remove that prospective juror.

Under the Sixth Amendment, every criminal defendant has the right to trial by an impartial jury. *Duncan v. Louisiana*, 391 U.S. 145, 159 (1968). The Supreme Court has expressly held, however, that an erroneously denied challenge for cause by the defendant results in no constitutional error unless that juror is actually seated on the jury. *Ross  v. Oklahoma*,  487 U.S. 81, 88 (1988; *accord United States v. Martinez-Salazar*, 528 U.S. 304, 313 (2000). That

petitioner had to use a peremptory challenge to strike the jurors at issue is of no consequence, for "the loss of a peremptory challenge [does not] constitute[ ] a violation of the constitutional right[] to an impartial jury." *Ross*, 487 U.S. at 88. "So long as the jury that sits is impartial, the fact that the petitioner had to use a peremptory challenge to achieve that result does not mean the Sixth Amendment was violated." *Id.*; *see also Martinez-Salazar*, 528 U.S. at 307 ("[I]f the defendant elects to cure [a judge's error] by exercising a peremptory challenge, and is subsequently convicted by a jury on which no biased juror sat, he has not been deprived of any . . . constitutional right.").

Here, the juror whom petitioner contends should have been subject to a for-cause challenge was not seated on his jury. Instead, after the trial court denied petitioner's for-cause challenge, petitioner challenged him peremptorily. Because the allegedly biased prospective juror did not actually sit on the jury, and because petitioner does not allege that any of the jurors sitting on the jury were biased, petitioner is not entitled to habeas relief. *Accord*, *e.g.*, *Cunningham v. Bennett*, No. 02 CV 4635(ARR), 2005 WL 1162475, at *5 (E.D.N.Y. May 16, 2005).

> **B.      Ground Two: Trial counsel erroneously failed to object to "prejudicial hearsay" and testimony concerning prior alleged sexual practices between petitioner and the victim's mother.**

The Sixth Amendment provides in pertinent part that a criminal defendant "shall enjoy the right ... to have the Assistance of Counsel for his defence." U.S. Const. amend. VI. The Supreme Court has clarified that this is "the right to effective assistance of counsel." *McMann v. Richardson*, 397 U.S. 759, 771 n. 14, 90 S.Ct. 1441, 25 L.Ed.2d 763 (1970). Its purpose is "to ensure a fair trial"and therefore the "benchmark for judging any claim of ineffectiveness must be

whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result." *Strickland v. Washington*, 466 U.S. 668, 686, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984).

In order to prevail on a Sixth Amendment claim, a petitioner must prove both that counsel's representation "fell below an objective standard of reasonableness" measured under "prevailing professional norms," *id.* at 688, and that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different," id. at 694. *See also Wiggins v. Smith*, 539 U.S. 510, 123 S.Ct. 2527, 2535, 2542, 156 L.Ed.2d 471 (2003). A "reasonable probability" is "a probability sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694.

The performance and prejudice prongs of *Strickland* may be addressed in any order, and "[i]f it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice . . . that course should be followed." *Id.* at 697, 104 S.Ct. 2052. In evaluating the prejudice suffered by a petitioner as a result of counsel's deficient performance, the court looks to the cumulative effect of the alleged errors in order to determine whether the prejudice "reache[s] the constitutional threshold." *Lindstadt v. Keane*, 239 F.3d 191, 202, 203-04 (2d Cir.2001) (citing *Strickland*, 466 U.S. at 695-96, 104 S.Ct. 2052). The court must also keep in mind that "a verdict or conclusion only weakly supported by the record is more likely to have been affected by errors than one with overwhelming record support." *Strickland*, 466 U.S. at 696, 104 S.Ct. 2052. "'The result of a [criminal] proceeding can be rendered unreliable, and hence the proceeding itself unfair, even if the errors of counsel cannot be shown by a preponderance of the evidence to have determined the outcome.'" *Purdy v. Zeldes*, 337 F.3d 253, 260 (2d Cir.2003)

(quoting *Strickland*, 466 U.S. at 694) (alternation in *Purdy*)).

Petitioner raised on direct appeal his claim that trial counsel had been ineffective in failing to object to what he described as "prejudicial hearsay", as well as testimony concerning "deviant sexual practices" between petitioner and the victim's mother. The Appellate Division held that "the evidence, the law and the circumstances of this case, viewed in totality and as of the time of the representation, establish that defendant received meaningful representation[.]" *People v. Miles*, (citing *People v. Benevento*, 91 N.Y.2d 708, 712 ; *People v. Baldi*, 54 N.Y.2d 137, 147). As discussed further below, this holding was neither contrary to, nor an unreasonable application of, the Supreme Court's clearly established precedent for evaluating claims of ineffective assistance of trial counsel.

"Actions or omissions by counsel that '"might be considered sound trial strategy"' do not constitute ineffective assistance." *Mason v. Scully*, 16 F.3d 38, 42 (2d Cir.1994) (quoting *Strickland*, 466 U.S. at 689) (quoting *Michel v. Louisiana*, 350 U.S. 91, 101, 76 S.Ct. 158, 164, 100 L.Ed. 83 (1955) ("The mere fact that a timely motion to quash was not filed does not overcome the presumption of effectiveness. The delay might be considered sound trial strategy, particularly since the codefendant could not be found. We cannot infer lack of effective counsel from this circumstance alone.") (internal citation omitted)). Respondent argues that these decisions not to object to certain items of testimony were tactical in nature and part of a considered defense strategy. *See* People's Appellate Brief at 18-27, Respondent's Exhibit B.

As respondent has pointed out, trial counsel pursued a strategy that acknowledged that something had happened to D.C., but that D.C.'s injuries were not caused by Miles. *See* T.36 (Trial Counsel: "[A]ll the expert witnesses in the world don't establish that Mr. Miles was the

perpetrator of whatever happened to this child[.]"). Trial counsel elicited testimony from the prosecution's medical expert, Dr. Coyne, that he had "no idea" what caused the anal fissures seen during D.C.'s examination on June 16, 1998. Trial counsel also brought out that D.C. regularly visited a man named Dwayne Wooten ("Wooten"), whom she considered to be her real father. T.230. This testimony supported the defense theory that D.C. and her younger brother "were exposed to other dangers and to other perpetrators." T.38.

Another main theme of the defense was the victim's mother was an irresponsible and abusive parent. Trial counsel elicited that Cahee had to be visited by Child Protective Services, T.157-58, and that Cahee disciplined her children with a belt. T.182, 231, 397. Trial counsel used the victim's stated fear of being hit by her mother to argue that she was willing to say whatever her mother wanted to avoid being punished. T.513. This tied into the defense theory that Cahee coached her daughter into falsely accusing Miles of sexually abusing her because Cahee was angry about Miles' decision to leave after she had an abortion. T.394-95, 428-29. Trial counsel pointed out that Miles had provided much financial assistance to Cahee and observed that when he left, it meant that "gone forever [was] the easy ride . . . [and] the handouts." T.503.

Trial counsel pointed to other instances of false accusations to further undermine Cahee's credibility. For instance, he elicited from Cahee that she always told Miles, as well as her daughter, that Wooten was her daughter's father. Trial counsel then demonstrated that as far back as 1992, DNA testing had excluded Wooten as D.C.'s father. T.141-42, 149, 458-59.

With regard to trial counsel decision's not object to Cahee's testimony that Miles supposedly got "violent", it arguably was a strategic call given Cahee's admission that she was referring to a single incident where Miles "shook" her, and that she did not want him to leave as

a result of it. Thus, trial counsel was able to demonstrate Cahee's propensity to exaggerate.

With regard to the testimony that D.C. told her mother that she wanted petitioner to leave the household, trial counsel's decision not to object was not unreasonable. Petitioner himself had testified that he and Cahee had "heated" and loud arguments over her desire to end her pregnancy. *See* T.395, 430. Trial counsel argued that the discord between Cahee and petitioner over the terminated pregnancy was why petitioner moved out, not because he had molested Cahee's daughter. That the victim, a child, had sensed the tension between the two adults in her life could have been the reason why she allegedly wanted Cahee to end the relationship with petitioner.

Petitioner argues that trial counsel's unreasonably failed to object to Cahee's testimony that petitioner had asked her to engage in consensual anal intercourse. In a response to a question on direct examination, Cahee testified that petitioner "would want to have sex in a way that [she] did not want to have sex," referring to anal intercourse. T.88-89. Although Cahee's use of the word "would" suggested that this was a repeated occurrence, Cahee retreated from this position during cross-examination, admitting that they tried it on one occasion, and she did not like it. As respondent points out, Cahee did not testify that petitioner was upset with her about not liking anal intercourse; nor did she testify that petitioner repeatedly asked her to participate in it. T.150. For his part, petitioner testified that he found his sexual relationship with Cahee to be very satisfactory. He agreed that Cahee did not enjoy anal intercourse the one time they tried it, at her suggestion; petitioner stated that neither did he. T.407-06.

First of all, petitioner's appellate counsel did not suggest any legal basis for objecting to this testimony; he stated only that the testimony referred to "deviant sexual practices," as if that

were reason alone for overturning petitioner's conviction. Petitioner's Appellate Brief at 18. This Court does not see any reasonable probability that the trial court would have sustained an objection, had one been made. Petitioner accordingly cannot demonstrate that he was prejudiced.

Furthermore, as respondent argues, it arguably was part of trial counsel's defense strategy. Viewing the unobjected-to testimony in context, it was consistent with trial counsel's strategy of showing that petitioner and Cahee had a mutually satisfactory sexual relationship.

### C.    Ground Three: Erroneous introduction of expert testimony concerning child sexual abuse accommodation syndrome.

Petitioner claims, as he did on direct appeal, that the trial court erred in allowing the prosecution to present expert psychological testimony regarding child sexual abuse accommodation syndrome to explain the victim's delayed notification. The Appellate Division held that this claim was without merit, since "'[E]xpert testimony regarding . . . abused child syndrome or similar conditions may be admitted to explain behavior of a victim that might appear unusual or that jurors may not be expected to understand[.]'" *People v. Miles* (quoting *People v. Carroll*, 95 N.Y.2d 375, 387 (N.Y.) (alteration and ellipsis in *Miles*). The Appellate Division further found that the expert's testimony regarding the "elements of child sexual abuse accommodation syndrome was general in nature, and in presenting the testimony the People 'did not attempt to impermissibly prove that the charged crimes occurred[.]'" *Id.* (quoting *Carroll*, 95 N.Y.2d at 387).

Federal habeas corpus relief does not lie for mere errors of state law. *Estelle v. McGuire*, 502 U.S. 62, 68, 112 S.Ct. 475, 116 L.Ed.2d 385 (1991); 28 U.S.C. § 2254(a). Nevertheless, the Due Process Clause requires that state courts conducting criminal trials "proceed consistently

with 'that fundamental fairness' which is 'essential to the very concept of justice.'" *Dunnigan v. Keane*, 137 F.3d 117, 125 (2d Cir.1998) (quoting *Lisenba v. California*, 314 U.S. 219, 236, 62 S.Ct. 280, 86 L.Ed. 166 (1941)). However, testimony on child sexual abuse accommodation syndrome is admissible as a matter of New York state evidentiary law when it is relevant in a particular case. *E.g.*, *People v. Taylor*, 75 N.Y.2d 277, 552 N.Y.S.2d 883, 552 N.E.2d 131, 135 (N.Y. 1990) (conclude that introduction of expert testimony describing rape trauma syndrome may under certain circumstances assist a lay jury in deciding issues in a rape trial); *Matter of Nicole V.*, 71 N.Y.2d 112, 120-21(N.Y. 1987) (describing the "sexually abused child syndrome" as "a recognized diagnosis based upon comparisons between the characteristics of individuals and relationships in incestuous families . . . and the characteristics of the individuals and relationships of the family in question" and holding that the court could receive expert testimony describing the syndrome and the victim's conduct consistent with it); *People v. Keindl*, 68 N.Y.2d 410, 422, 509 N.Y.S.2d 790, 502 N.E.2d 577 (not an abuse of discretion to allow an expert to testify to the range of psychological reactions suffered by children who had been the victim of sexual abuse by their stepparents to rebut defendant's attempt to impair the credibility of the victims by evidence that they had not promptly complained of the crimes); *People v. Henson*, 33 N.Y.2d 63, 349 N.Y.S.2d 657, 304 N.E.2d 358 (holding that evidence of "battered child syndrome", based as it was on objective evidence of injuries and the idiosyncratic nature of those resulting from battering, was admissible at the trial of a mother and father accused and convicted of criminally negligent homicide in the death of their four-year-old son where the parents had contended that the child's injuries were accidental).

In the instant case, Miles cannot demonstrate that the trial court committed any error in

allowing Perkowski to testify regarding child sexual abuse accommodation syndrome. As the above-cited cases illustrate, the admission of expert testimony concerning child sexual abuse accommodation syndrome has been deemed proper, in appropriate circumstances, under New York state evidentiary law. The testimony was not offered to prove that the acts of sodomy against D.C. had, in fact, occurred, and the jury was advised that it was not to be used for that purpose. Instead, the expert testimony was presented to "educate the jurors about a common but seemingly puzzling reaction (delay in reporting) to an unusual occurrence unlikely to have been experienced by the jurors[,]" *George v. Edwards*, Nos. 01-CV-6481(JBW), 03-MISC-0066(JBW), 2003 WL 22964391, at *4 (E.D.N.Y. Sept. 4, 2003), i.e., being sexually abused as a child. Because "[a]dmission of this testimony was probative and not an abuse of the trial court's discretion[,]" *id.* and not erroneous under state law, habeas corpus relief on this ground is not warranted. *Accord*, *e.g.*, *id.* (holding, on habeas review of a state criminal proceeding on charges of rape, sexual assault, sexual abuse, and endangering the welfare of a child, that admission of expert psychological testimony about rape trauma syndrome did not deprive petitioner of a fair trial so as to warrant habeas relief).

**Ground Four: Insufficiency of the evidence to support the convictions**.

The Due Process Clause of the Fourteenth Amendment of the United States Constitution mandates that a defendant in a criminal case be convicted only upon proof beyond a reasonable doubt of every element necessary to constitute the crime with which he is charged. *See Jackson v. Virginia*, 443 U.S. 307, 315, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979); *In re Winship*, 397 U.S. 358, 364, 90 S.Ct. 1068, 25 L.Ed.2d 368 (1970). There is a "very heavy burden placed upon a defendant challenging the sufficiency of the evidence underlying his conviction." *Knapp v.*

*Leonardo*, 46 F.3d 170, 178 (2d Cir.1995) (internal quotation marks and citations omitted).

"'The relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" *Quartararo v. Hanslmaier*, 186 F.3d 91, 97 (2d Cir.1999) (quoting *Herrera v. Collins*, 506 U.S. 390, 401 (1993)). The reviewing court must "decide whether the record is 'so totally devoid of evidentiary support that a due process issue is raised.'" *Bossett v. Walker*, 41 F.3d 825, 830 (2d Cir.1994) (quoting *Mapp v. Warden, New York State Correctional Institute for Women*, 531 F.2d 1167, 1173 n. 8 (2d Cir.1976)).

A federal court reviewing a sufficiency of evidence claim does not make an independent determination as to whether the evidence demonstrates guilt beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. at 318-19. Rather, the habeas court "stands in the shoes of the state trial court." *Mallette v. Scully*, 752 F.2d 26, 31 (2d Cir.1984). "On a sufficiency question raised in a habeas proceeding, a federal court must assess the historic facts to determine whether the evidence supports the jury verdict." *Mallette*, 752 F.2d at 31 (citing *Jackson v. Virginia*, 443 U.S. at 318). " Since it is the trier of fact that weighs the evidence, determines credibility and draws inferences from historic to ultimate facts, a federal court, in analyzing sufficiency, should not 'ask itself whether it believes that the evidence at the trial established guilt beyond a reasonable doubt.'" *Mallette*, 752 F.2d at 31 (quoting *Woodby v. Immigration and Naturalization Services*, 385 U.S. 276, 282 (1966)). Rather, it must construe the evidence in the light most favorable to the prosecution, and defer to the jury's resolution of any conflicts in the testimony and to its assessment of the credibility of witnesses. *Jackson*, 443 U.S. at 319; *see also Herrera*, 506 U.S. at 401-02 (noting that court should ask only whether decision to convict was rational, not

whether it was correct). "[A]s long as any competent evidence went to the fact-finders from which they could infer guilt beyond a reasonable doubt, the conviction will stand." *Martin v. Scully*, 748 F. Supp. 159, 164 (S.D.N.Y. 1990) (quoting *McShall v. Henderson*, 526 F. Supp. 158, 161 (S.D.N.Y.1981) and citing *United States v. Adegbite*, 877 F.2d 174, 180 (2d Cir.1989); *Neumann v. People of New York*, 526 F. Supp. 286, 291 (S.D.N.Y.1981) ("Petitioner is not entitled to a writ of habeas corpus merely because his conviction is based upon possibly conflicting interpretations of the evidence and testimony.")). When faced with a record from which conflicting inferences may be drawn, the habeas corpus court must presume, even if the record does not show it affirmatively, that the trier of fact resolved the conflict in favor of the prosecution and must defer to that resolution. *See Wright v. West*, 505 U.S. 277, 296-97, 112 S.Ct. 2482, 120 L.Ed.2d 225 (1992).

Essentially, Miles contends that his denials were more credible than the testimony of the prosecution's witnesses implicating him in the sexual abuse of D.C. A "habeas court must defer to the assessments of the . . . credibility of the witnesses that were made by the jury and may not substitute its view . . . for that of the jury [.]" *Frazier v. New York*, 187 F. Supp.2d 102, 109-10 (S.D.N.Y. 2002) (citing *Herrera v. Collins*, 506 U.S. at 401-02). Here, the jury's determination was strongly supported by the evidence. Despite her young years, the victim testified clearly and consistently. Her testimony was corroborated by Nurse Wallace's and Dr. Coyne's testimony regarding the evidence of physical injury, as well as the photographs documenting those injuries. Finally, Perkowski provided expert testimony to explain D.C.'s failure to report the abuse at an earlier time. Although the defense challenged the testimony of each of these witnesses, the jury was the ultimate arbiter of witness credibility. *See United States v. Shulman*, 624 F.2d 384, 388

(2d Cir. 1980) ("Under our system of jurisprudence, as noted above, normally the resolution of issues of credibility is exclusively the province of the jury. *United States v. Taylor*, 464 F.2d 240, 245 (2 Cir. 1972); *United States v. Weinstein*, 452 F.2d 704, 713-14 (2 Cir. 1971), *cert. denied*, 406 U.S. 917 (1972)."). Miles' claim that the evidence was insufficient depends upon this Court agreeing that the jury's credibility determinations should be replaced with petitioner's judgment of his own credibility. Not only is this unauthorized, *e.g.*, *United States v. Khan*, 53 F.3d 507, 514 (2d Cir.1995), it is unwarranted on the trial record. Thus, Miles' claim that he was convicted upon less than legally sufficient evidence is without merit.

### E. Ground Five: Violations of *People v. Rosario* and *Brady v. Maryland*

After his direct appeal, but before he had received a copy of the defense file from his trial attorney, petitioner filed a request via the Freedom of Information Law with the Buffalo Police Department seeking documents concerning the investigation and prosecution of his case. Petitioner asserts that he only received four (4) pages of documents from the Buffalo Police Department in response to his request. Petitioner claimed that "the improbability of this actually occurring (making no reports) is so minute as to compel a finding that both the Prosecutor's office, and Buffalo Police Department alleging that no statements exist from the mother, or the alleged victim on the date of the complaint." Petitioner's Motion to Vacate Judgment dated 1/9/2003 at p. 6. Believing that there must exist documents that were deliberately withheld from the defense by various officials, petitioner then asserted, by means of a C.P.L. § 440.10 motion, a violation of his due process rights under *Brady v. Maryland*, 373 U.S. 83, 87, 83 S.Ct. 1194, 1196-97 (1963) and under the discovery rule announced by the New York Court of Appeals in *People v. Rosario,* 9 N.Y.2d 286, 213 N.Y.S.2d 448, *cert. denied*, 368 U.S. 866, 82 S.Ct. 117

(1961).[6]

The *Brady* rule requires State as well as Federal prosecutors must turn over exculpatory and impeachment evidence, whether or not requested by the defense, where the evidence is material either to guilt or to punishment. *See, e.g.*, *Strickler v. Greene*, 527 U.S. 263, 280, 119 S.Ct. 1936, 1948 (1999); *United States v. Bagley*, 473 U.S. 667, 676, 682, 105 S.Ct. 3375, 3380, 3383-84 (1985); *United States v. Agurs*, 427 U.S. 97, 107, 96 S.Ct. 2392, 2399 (1976). The *Brady* rule also encompasses evidence known only to the police: "In order to comply with *Brady*, therefore, 'the individual prosecutor has a duty to learn of any favorable evidence known to the others acting on the government's behalf in this case, including the police.'" *Strickler v. Greene*, 527 U.S. at 281, 119 S.Ct. at 1948 (quoting *Kyles v. Whitley*, 514 U.S. 419, 437, 115 S.Ct. 1555, 1567 (1995)).

The prosecutor argued, and the trial court agreed, that petitioner could not properly allege a discovery violation, given his acknowledgment that he had not yet seen his file and could not say what the prosecutor did disclose. As the prosecution argued in opposition to the C.P.L. § 440.10 motion, petitioner "merely speculate[d] that the trial prosecutor withheld *Rosario* documents [i.e., witness statements] and other material that he imagines would be exculpatory." People's Answering Affidavit at p. 2, ¶8. The trial court denied petitioner's motion on the basis that his "moving papers and exhibits do not contain sworn allegations that support, tend to prove or demonstrate a basis for the relief requested." C.P.L. § 440.10 Order dated 6/3/2003 at p. 2

---

[6]     The *Rosario* rule has been codified at C.P.L. § 240.45(1)(a), which provides:[T]he prosecutor shall ... make available to the defendant: (a) Any written or recorded statement, including any testimony before a grand jury and an examination videotaped pursuant to section 190.32 of this chapter, made by a person whom the prosecutor intends to call as a witness at trial, and which relates to the subject matter of the witness's testimony[.]

(citing N.Y. CRIM. PROC. LAW § 440.30(4)(b)).

"While the Brady rule that due process requires prosecutors to provide materially exculpatory evidence to the defense and New York's Rosario rule, requiring disclosure of witness statements in criminal cases, overlap considerably, they are not identical." *Skinner v. Duncan*, 2003 WL 21386032, at *25 (S.D.N.Y. June 17, 2003) (citing, *inter alia*, *Landy v. Costello*, No. 97-2433, 141 F.3d 1151 (table), 1998 WL 105768 at *1 (2d Cir. Mar. 9, 1998) ( Rosario obligations arise solely under state law)). Federal habeas courts have consistently held that Rosario claims are not subject to review because they arise exclusively under state law. E.g. , Pena v. Fischer, 00 Civ. 5984, 2003 WL 1990331 at *10 (S.D.N.Y. Apr. 30, 2003); Johnson v. Filion, 232 F.Supp.2d 98, 100 (S.D.N.Y.2002); Green v. Artuz, 990 F.Supp. 267, 274 (S.D.N.Y.1998) ("Failure to turn over Rosario material is not a basis for habeas relief as the Rosario rule is purely one of state law.")..

Miles' *Brady* claim must fail because he provides "no evidence to support his allegations[.]" *Skinner*, & n.38 (citing, *inter alia*, *United States v. Love*, No. 02-2953, 2003 WL 1796009 at *2 (7th Cir. Mar. 27, 2003) ("[A]ny *Brady* claim would be speculative and therefore frivolous [where] there is no evidence in the record that the prosecution suppressed [police] reports or that they even existed."); *Chandras v. McGinnis*, No. 01 Civ. 2519, 2002 WL 31946711 at *5 (E.D.N.Y. Nov. 13, 2002) ("In the absence of credible evidence contradicting the ADAs' denials" that a cooperation agreement existed, petitioner's Brady claims denied as meritless.)). " As a matter of law, mere speculation by a defendant that the government has not fulfilled its obligations under *Brady v. Maryland*, . . . , is not enough to establish that the government has, in fact, failed to honor its discovery obligations." *United States v. Upton*, 856

F. Supp. 727, 746 (E.D.N.Y.1994) (citing, *inter alia*, *United States v. Zavala*, 839 F.2d 523, 528 (9th Cir.) (*per curiam*) (no *Brady* violation in failure to disclose probation reports with statements of various government witnesses because reports in control of probation department, not prosecution), *cert. denied*, 488 U.S. 831 (1988)).

      **F.**     **Grounds Six and Seven: Ineffective assistance of trial counsel.**

Ground Six and Ground Seven of Miles' petition contain the same allegations–that trial counsel unreasonably failed to seek certain unspecified statements from witnesses, failed to properly investigate the case, and failed to consult with and/or call a medical expert to testify at trial. The first claim was raised in the same C.P.L. § 440.10 motion in which Miles argued that he sustained *Brady* and *Rosario* violations. Like his stand-alone *Brady* and *Rosario* claims, the ineffective assistance of trial counsel claim premised on the failure to seek witness statements is based solely on Miles' speculative assertions. As noted above, Miles has offered no proof of the existence of the alleged witness statements or other evidence that the prosecution's office and the police department allegedly colluded to prevent him from obtaining. Trial counsel can hardly be faulted for failing to discover documents the existence of which is entirely speculative. Accordingly, this aspect of Miles' ineffective assistance of trial counsel claim is without merit.

The contentions concerning trial counsel's failure to retain a medical expert witness and failure to conduct a proper investigation were raised in connection with Miles' December 2003 C.P.L. § 440.10 motion. Review of these motion papers reveals Miles' argument is that trial counsel's investigation necessarily required consultation with a medical expert witness "concerning the discrepancies in the two medical reports concerning the hymen being missing, or intact." Petitioner's C.P.L. § 440.0 Motion dated December 2003, at p 7. Petitioner has not

argued that trial counsel was ineffective in failing to consult with an expert witness about any other aspect of the victim's injuries or the victim's mental state.

By "discrepancies," petitioner is referring to the notation by the treating physician, Dr. Steif, that the victim's "hymen [was] absent", and the prosecution's medical expert, Dr. Coyne, who observed that the victim's hymen was regular, smooth, and intact. Petitioner argues that "counsel's failure to bring this pivotal information (hymen being intact after months of alleged sexual abuse) . . . is inexcusable under any theory . . . ." *Id.* Petitioner further argues that trial counsel should "have consulted a medical expert to determine if Dr. Steif['s] report was in error" and "[a]n intact hymen in itself would be [a] reasonable probability that the result of the proceeding would have been different . . . ." *Id.* Contrary to petitioner's contention, this discrepancy was put before the jury–through Dr. Coyne's expert witness testimony that his examination clearly revealed to no injury to the victim's intact hymen, a conclusion which trial counsel attempted to exploit for the defense by arguing that it raised a reasonable doubt. *See* T.493-94. Dr. Coyne testified that a hymen can never be described as "absent." The Court cannot see how having another expert witness testify that the victim's hymen was intact would have assisted petitioner more than having the prosecution's own expert medical witness testify to his firm belief concerning the incorrectness of Dr. Steif's conclusion. Under the particular circumstances of this case, I find that Miles has not demonstrated that trial counsel's performance was outside of prevailing professional norms. Furthermore, Miles has not shown that there is a reasonable probability that the outcome of his trial would have been different but for counsel's alleged errors. Therefore, habeas relief is not available to him on Grounds Six and Seven.

IV.     **Conclusion**

For the reasons set forth above, the petition for a writ of habeas corpus filed by petitioner Pearson Miles, Jr. is **denied**. Furthermore, the Court finds that petitioner has not made a "substantial showing of the denial of a constitutional right" pursuant to 28 U.S.C. § 2253(c)(2) ("A certificate of appealability may issue . . . only if the applicant has made a substantial showing of the denial of a constitutional right."); *see also Lucidore v. New York State Div. of Parole*, 209 F.3d 107, 112 (2d Cir. 2000). Therefore, no certificate of appealability shall issue with respect to any of petitioner's claims.

**IT IS SO ORDERED.**

/s/ Victor E.Bianchini

_____
VICTOR E. BIANCHINI
United States Magistrate Judge

Dated:          September 22, 2010
                Rochester, New York.